Our next and final case of the morning is Frederick v. Farris, No. 20-6131. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, my name is Emma Rollins and I represent the appellant, Mr. Darrell Frederick. Your Honors, based on trial and appellate counsel's ineffectiveness, this case represents the type of extreme malfunction in the state criminal justice system that warrants habeas relief. In this capital case, trial counsel failed to call a single live witness. And although trial counsel's first stage strategy was that Mrs. Frederick's injuries were caused by an accidental fall, he failed to consult with a medical examiner, he failed to cross-examine the medical examiner on valuable impeachment evidence, and he did not consult with or call his own independent forensic pathologist. Likewise, in the punishment phase, despite trial counsel's theme that Mr. Frederick suffered from brain damage caused from a head injury, and despite his theme that Mr. Frederick had a challenging childhood, he did not consult with a single mental health expert who could diagnose Mr. Frederick, he did not put on any mental health evidence, and he did not even talk to Mr. Frederick's family members. Counsel? Yes, Your Honor. I have just a threshold general question. Typically, a lawyer can rely on their co-counsel's work. In this case, how much can we rely on Ms. Hammerston's work and investigation in assessing the performance of Mr. Rowan? With respect to Mrs. Hammerston's performance, as we know, Mr. Rowan got on the case about 11 months before this went to trial. It doesn't appear that Ms. Hammerston did much first-stage investigation at all. In fact, the bulk of the evidentiary hearing that was held on post-conviction centered around her second-stage investigation. By her testimony, she was able to locate two of Mr. Frederick's family witnesses, and she in fact listed them on a witness list and thought that they would provide helpful information for Mr. Frederick. She also made copious notes in her records about the family members she had been unable to locate at that time. But with respect to her testimony about how much investigation she did, she really spoke in very serious generalities. So my question actually is not about the nature of her investigation, whether it was complete or not. It's, we're assessing Mr. Rowan's performance. And in assessing his performance, we're considering whether his investigation itself or just the choices that he's making were reasonable based on Ms. Hammerston's investigation. What I'm interested in is, what are the sort of applicable principles, guiding principles that you can direct us to to understand to what extent we can rely on her investigation to assess his performance? Well, in the end, Trial Counsel Rowan was ultimately responsible. And under Strickland and Appiah and Wiggins, he held the ultimate responsibility to investigate the theories of his case. It wasn't clear what Ms. Hammerston's first stage theory was going to be based on what we had in the record. Okay, but the question was about, I think you were talking about the second stage witnesses, which were the family members. Yes, Your Honor. So what was clear or unclear about the second stage witnesses and his ability to rely on what she said about them? Well, what she said about them was that two of the witnesses she listed would have been compelling second stage witnesses. So based on her assessment of the investigation and the witnesses, they would in fact have been compelling. But we also know that Mr. Rowan made no attempt to even speak to these witnesses. He made no attempt, and this was by his own admission. He made no attempt to locate additional witnesses, and these specific witnesses could have helped him with the theory of the case that he articulated. Specifically, Jerome, the brother Jerome that Mrs. Hammerston had in fact not located, but noted in her files, needed to be spoken with. So at the evidentiary hearing, did you present evidence that he could have found Jerome at the time? Because at the time, she couldn't find Jerome, and it was, the evidence was that he was transient at the time. That was, I didn't present any of the evidence. Okay, well, whoever presented the evidence, yes. Correct, there was some evidence. You're relying on somebody else's presentation of evidence. That is correct. There was evidence that Jerome was in fact transient at the time, but nevertheless, post-conviction counsel had no, they were able to find his brother Jerome. And there's no indication that Mr. Rowan ever looked. Decisions can't be reasonable if there's no reasonable investigation preceding them. Just maybe at the risk of repetition, but putting it another way, why did Mr. Rowan perform deficiently by relying on Mrs. Hammerston's investigation? I would say two reasons. One, because her investigation was not as thorough as the district court and the OCCA characterized when she was testifying at the evidentiary hearing. She could only speak in general terms. She couldn't even get the names of the brothers and sisters correct. And so that investigation in and of itself wouldn't appear to be reasonable on its face, but it certainly wouldn't relieve Mr. Rowan of following up and attempting to locate additional witnesses. And I think the most egregious ineffectiveness with respect to second stage was Mr. Rowan's complete failure to present any evidence of brain damage. And let's just talk really quickly about what evidence was presented in the second stage. With respect to second stage, after the state presented 14 witnesses in aggravation, Mr. Rowan simply had a cold record read into evidence that was Mr. Frederick's father's testimony from a 1982 post-conviction hearing. That was it. And this was in the face of ample mitigation evidence that was available. And as the district court found, with respect to the brain damage evidence that could have been presented by a witness like Dr. McGarrahan, the district court found there can be no dispute that Mr. Rowan was aware that Petitioner potentially suffered from brain damage. Not only was he alerted to it. Counsel, we're kind of moving from one issue to the other. Family members on the one hand, brain damage on the other. Could I just stay with the family members for just a second? And that is, as I understand one of the state's arguments in terms of family testimony, family testimony about Mr. Frederick's taking care of his mother would have been based largely on what he told them. And if that's correct, and you may want to respond to that, but as a more general question, why was the OCCA's conclusion that Mr. Frederick wasn't prejudiced by trial counsel's failure to present the family evidence unreasonable? Sure. Well, I would first, I would dispute slightly that they did have some firsthand knowledge. Now, there was some discussion and evidence taken at the evidentiary hearing that some of it was based on what Mr. Frederick had told them. But they did witness certain firsthand evidence and had firsthand knowledge of the way in which he had interacted with his mother in a kind and loving way. But I think the way in which the OCC acted unreasonably with respect to this good evidence is that they discounted it to irrelevance and Porter commands that we cannot do that. Particularly in a case when there's been absolutely no mitigation evidence presented to begin with. This was the precise type of half-hearted and skeletal mitigation case that this case is, that this court and the Supreme Court have both derided. But I would also add that it wasn't just favorable evidence, good guy evidence presented that these witnesses could have discussed. Jerome could have put the meat on the bones about this type of, this deprived background that Mr. Frederick experienced. According to the testimony of Nathan Frederick Sr. that the jury heard, Mr. Frederick grew up in a very sheltered home. And we know that that's not true. Based on the facts generated on post-conviction, we learned that Mr. Frederick lived in a home whose father ruled the house with severe discipline and abuse. This was a man who did not allow his children to partake in any school activities. They were forbidden from celebrating holidays based on their religious beliefs. And they were forced to work at a service station day in, day out. And when they did violate his father's life principles, they were beaten severely with rubber hoses, with extension cords, and almost on a daily basis. In addition, Mr. Frederick's father, who was a man of the cloth, was living the second life where he was impregnating members of his own congregation and bringing home five children into the family home with no explanation to the family. And that's precisely the type of evidence that this court in Anderson found to be compelling, particularly in a case when the jury heard nothing, no reason to spare Mr. Frederick's life, other than the fact that he had a car accident and was forever changed. So with that, I'd like to go back to the brain damage evidence, because I believe it's the most compelling evidence here that trial counsel omitted. Trial counsel did nothing to support brain damage, but it was clear that was his entire theory. And as Dr. McGarahan testified at the evidentiary hearing on post-conviction, Mr. Frederick, based on his childhood head injury and based on the fact that he was a prison boxing team in the 70s and did not wear headgear, clearly showed signs of organic brain damage that affected impulse control, the ability to contextualize situations, the ability to read gray areas, and things of that nature. Counsel, but isn't the problem that I'm struggling with is whether to satisfy prejudice, you would need a direct causal link for Dr. McGarahan to have testified to a direct causal link between the organic brain damage and the crime? Well, at first I would say that there is not a requirement for a direct causal link under Tenard v. Dredge. That is not a necessary showing, but I understand. And that's not confined just to that case? No, but I will say that the facts show she actually did testify to that. So I would submit that the OCCA's finding that she concluded that the brain damage wouldn't have affected his ability or been a contributing factor to this crime is an unreasonable determination of fact. While Dr. McGarahan initially agreed that the type of brain damage from which Mr. Frederick suffers does not typically impair his day-to-day activities like going to the grocery store or holding certain jobs, she immediately explained after that statement that it does impact activities like making complex decisions, interacting with other people, seeing gray areas, abstract reasoning, and engaging in relationships. Where was the testimony about a direct link to the crime at hand? I'm sorry, I shouldn't have interrupted you. I should have gotten there more quickly. But Dr. McGarahan further testified extensively about how Mr. Frederick's brain damage was certainly a contributing factor, and that was a quote, to his violent behavior. As you know, after the 14 aggravated, excuse me, the 14 stakes witnesses testified, they were fully aware of Mr. Frederick's violent background. Taking aside this situation, I would like to go back to some first stage issues if I have time. Well, before we leave Dr. McGarahan, didn't Dr. McGarahan also say you typically don't see unprovoked aggression, even with frontal lobes damages, in individuals who are in their fifth or sixth decade of life? Now, why doesn't that show that the OCCA's determination of no prejudice on the brain damage issue was reasonable under EDPA? Well, I think because the OCCA in that situation conflated two issues. Yes, Dr. McGarahan testified that typically men, typically as they age and their testosterone levels drop, they become less violent, but she was talking about the population as a whole. She certainly didn't say that that would excuse or exclude those with brain damage. Here, she went on to say that when you look at the test data of Mr. Frederick's impairments, it's certainly a partial explanation to the crime in this case. And so I think that we are kind of conflated. Well, that's different than a causal link or a substantially contributing factor, as we've been talking about them here. That's a partial link sounds like a little bit thinner connection. Well, Judge Carson, she also said it's certainly a contributing factor. So she said that in addition to that. All right. Okay. So certainly a contributing factor is not quantitative. But go ahead. Okay. I also think that it's ‑‑ I'm sure that the State's going to point out and try to analogize this case to Little John 2. And that also involved Mr. Rowan, where this court found that he performed efficiently for failing to present brain damage evidence. But after an evidentiary hearing, it was found that it wasn't so prejudicial to the defendant. And that involved impulse control disorder and ADHD. But in that case, there was a wide gamut of other mitigation presented to the jury, including the fact there was a social historian that testified that Mr. Little John was exposed to drugs and alcohol in utero, that he had been abandoned by his 16‑year‑old mother who was addicted to crack cocaine, and that he had gone through a lot of problems in life. And they also presented other mental health evidence. Here we have to go back to the fact this jury was told nothing about Mr. Frederick. Nothing. And that's after Mr. Rowan announces in first stage that he was going to present certain evidence of his background and talk about this head injury. He told them nothing other than this very short excerpt of his father's nearly 30‑year‑old testimony. Could I come back to Little John? Yes. You were alive, State talks about. Little John, you talk about Barrett. Barrett, yes, sir. And in Barrett, this court said that that case differed from Little John because in Little John, the mental health evidence would have opened the door to introduction by the prosecution and harmful evidence that the defendant suffered from antisocial personality disorder. Why wouldn't that also be the case here? Why isn't this more like Little John than it is like Barrett? Well, I would argue that this jury had been exposed to 14 witnesses who detailed the violent behaviors. While they might not have been given the ASPD diagnosis, they certainly had before them all of the evidence of prior violent behaviors. But what Dr. McGarrihan could have done with respect to an ASPD, if it were to open the door, is she could tell you, or the jury, that the symptomology that was caused and displayed by this brain damage overlaps with ASPD, and it's really hard to distinguish the two. But in fact, 85% of prison population could be diagnosed with ASPD, so it's not that much of a distinguishing factor. But here she said it was for the Little John. It was, but in this case, I don't believe in Little John. There was a lot of testimony to show with ADHD that ADHD symptoms manifest in a way that look like ASPD. And I believe the DSM requires that where there is brain damage to the extent that we see here, that an ASPD diagnosis is not an appropriate diagnosis. And that's what Dr. McGarrihan could have done. While, yes, the jury never heard the words that Mr. Frederick suffered, or excuse me, had ASPD, they heard 14 witnesses detail violent conduct, and they had no explanation, they had no context to understand why this continued kind of violent behavior was exhibited from Mr. Frederick. If I may go back to first stage, unless the court has some more questions on second stage. Let me go ahead and ask you some questions. I don't think we ever quite got through on. Do you agree that it was your burden in the prior proceedings, and understanding that it wasn't you, that the person who preceded you or persons who preceded you, that it was their burden in the prior proceedings, for example, with Jerome Frederick, to show that he was in fact available and findable at the time that Mr. Rowan was trying in this case? No, I don't agree with that, Your Honor, because. Okay, because if the argument is, well, he never even looked for Jerome Frederick, well, what if Jerome Frederick was out of the country for two years? I mean, then it's harmless. Then it doesn't matter that he didn't look, because he wouldn't have found him. I disagree, Your Honor. I believe that the case law is clear that decisions are only reasonable insofar as they are preceded by reasonable investigation. Okay, so your position then is that you can tee up these things that he didn't do, and that if it would have been impossible for him to do anyway, there's still prejudice and you get a reversal. I believe if we had some evidence to show Mr. Rowan tried and it was an impossibility, perhaps that would be a different question. But that wasn't what occurred here. He tried nothing. He blew them off completely by his own description. Well, I mean, there's some argument about whether his description of what he did was maybe understated. But, okay, I'm just trying to drill down here. So you're saying in light of his, I'll give it to you, undisputed testimony that he didn't try to talk to them, that there was no burden on the defense part to show that if he had tried, he could have found them and they would have been willing to testify at that time? All I can say is that post-conviction counsel found him and he was clearly willing to testify. I guess it's just speculative. I mean, well, that's my point. I mean, it is speculative that he could have found them. But what's not speculative is that Rowan never tried. He did nothing. I agree. But not doing something doesn't establish prejudice in and of itself, does it? No, it doesn't. But in this case, prejudice has been established because Rowan did nothing else. And Jerome could have painted the picture of this traumatic childhood, and it's the childhood of the type that this Court has found to be compelling, particularly in a case where there's been nothing else presented. Let me ask you another question. And this has to do with him not having experts to talk about brain damage and things like that. At least some evidence in the record suggests that the defendant wasn't cooperative in meeting with psychologists or sociologists or other experts. You know, at what point does that have legs for the government? Well, I will say this. There's just as much evidence in the record to show that Mr. Frederick had been cooperative. Okay. So what was that? Let's be specific. Yes. At the time he was working with Hammerston and Rowan, that he was willing to be cooperative with respect to seeing experts and cooperating with them. Well, based on past conduct, he had been evaluated by Sean Roberson in two prior competency evaluations and cooperated fully. Okay. And how many years before was that? I can't say for sure, but it was several years. Okay. With respect to Ms. Hammerston, there was some discussion that he was uncooperative. But the only attempt at an interview by any type of expert was Art Williams. He wasn't qualified to give any type of mental health evaluation. He was a sociologist. Well, I understand that. But, I mean, whether he was qualified or not wasn't the question. He wasn't cooperating with experts. When is Rowan supposed to then say, okay, well, you wouldn't qualify. I mean, I know maybe you disagree that he's an unqualified expert, but I've got a psychologist over here. Will you talk to him? Right. I think the district court got it right at this, the federal district court, that when you make mental health evidence the centerpiece of your mitigation, you have to try. And then we look at some Supreme Court cases, namely Sears and I believe Rompia. In those cases, there were defendants who were somewhat disagreeable. Either they didn't want to present mitigation or they were reticent about investigation. But the burden is on the trial attorney to get this done, particularly when that's the centerpiece theme of their second stage case. What if you have a defendant that, say, won't come out of his cell? Well, that wasn't this defendant. I mean, that could pose a different set of circumstances. Those were not the circumstances. Are you saying there's never, in this case, there was never an instance where he wouldn't come out of his cell to meet with the sociologist? Because that's in the record. I believe he refused to come out with the sociologist once, but he did eventually sit with Dr. Williams and was interviewed by him. And Dr. Williams was able to glean from that that he was a suspicious and paranoid man and alerted to many red flags for brain damage, from which Mr. Rowan, and I would also add, the whole reason Kathy Hammerstein was replaced in this case was because of her inability to work with him. And during that in-camera hearing where Ms. Hammerstein was replaced, it was discussed, are you going to cooperate with witnesses? And I believe he said yes. So there's ample evidence in this record. There's certainly not much evidence to show he would refuse to cooperate. He's gone on to cooperate with expert witnesses, including Dr. McGarrihan, since this trial. But here, trial counsel didn't even attempt it. I mean, if it's teed up by the government at your evidentiary hearing and other arguments that the reason there were no experts is because he wouldn't cooperate, isn't it the defense burden at that point to show, well, yes, he would have. And he would have, and they should have had him there for him to cooperate with. Yes, and I believe that the defense met their burden in that situation at the evidentiary hearing here. I mean, what is your evidence in addition to the he several years before he agreed to meet with somebody? Well, that he actually did, in fact, meet with Dr. Williams to talk about some of his social history. I mean, he may have been reticent and he may have been paranoid, but he, in fact, met with him. Okay. With respect to first stage, despite the fact that Mr. Rowan's theory was that this was an injury resulting from a fall, he didn't even meet with the medical examiner. And had he met with the medical examiner, he would have learned that the medical examiner based his opinion that the murder was, excuse me, that the death was homicide based on wholly inaccurate information contained in the investigator's narrative. The investigator's narrative stated that an eyewitness, Dajon Diggs, saw the assault, saw Mr. Frederick assault his mother with a brick. That is completely inaccurate. And Dr. Harrison, at the federal evidentiary hearing, admitted on page 278 of volume 2 that the investigator's narrative, quote, factored into his decision to rule the death a homicide. And in volume 2, page 303, he admitted that the investigator's narrative, quote, certainly weighed very heavily along with other information he received. So OCCA was completely unreasonable in its factual determination that it had no bearing on his ultimate conclusion. I see that I only have four minutes left. I'd like to save the rest for rebuttal unless the court has some questions. Can we go on and give her some time? Well, why don't we see where we are after the state? If we need extra time, we'll do it. Should I go ahead? Go ahead and reserve it, and then I'll come back to you. Okay. Thank you. Thank you. May it please the court. My name is Joshua Lockett, and I represent the respondent appellee in this case, Jim Ferris. What is a capital defense attorney to do when they realize they've been handed a bad case, one with strong evidence of guilt, with a client who has a prior criminal record that is extensive, and a client who is, by all accounts, unwilling to assist in any development of mitigation, where even the defendant's own family seems dead set against helping him? Well, because since you brought it up, what about the idea that he made no effort to personally contact any of these family members? And before you say, Hammerston did. She didn't reach them all, and instead of going out and trying to hunt down any remaining family members who might step up to the plate, he just let it go. I mean, what do you do in the face of that kind of failure to do anything? Okay. I'd like to refer back to a question that Judge Rossman asked earlier, and that is the fact that Rowan could rely on those efforts that Hammerston made. I know you said that. Let's bypass that. But I do want to point out one thing in this situation, and that is the fact that when Rowan replaced Hammerston, it was one month until trial, and Rowan said that, you know what? By everything that I could tell, she had done an extensive investigation. We know that Hammerston said that herself. Rowan said it looked like everything had been done. He praised the work that she did in this case. And what did all that work uncover? It uncovered an aunt and a second cousin out of 13 siblings. But out of that investigation, he developed a theory, and his theory consisted of, I think that you would agree, the complicated childhood and some sort of result of this car accident. He was forever changed. He did nothing to pursue expert support or family witness support for the very theories he was advancing. How is that not deficient performance? You mentioned experts there, but you also mentioned family. I want to make sure I know which one we're dealing with here. Well, I'm interested in both. Okay. Well, we'll start with the family because I'd like to make sure that this court understands or fully appreciates what Rowan was dealing with in this case because, first of all, you have the petitioner assaulted his mute, deaf mother in the kitchen because she had the audacity to be hungry and thirsty. He assaulted his niece in the house because she had the audacity to try to help her poor grandmother get the food and drink that she wanted, chased her around outside the house. I split the individuals who testified at the evidentiary hearing into two groups. You have the aunt and the two second cousins because, generally, what they were going to say was he was a good son. He was loving. He was caring. He was kind. None of them ever knew him to be angry or anything like that. I'm sorry, but he had just killed his mute, deaf grandmother for being hungry. I don't think any jury in the world is going to sit back and accept that or take that in. If anything, they're going to be offended by the fact that they're trying to present evidence that this gentleman is a good son and that he loved his mother. So that has to do with the fact that I just don't think that Rowan, because we know that he did read the two witness summaries that were in the case because they were filed. I think... But he didn't talk to any of those. You're right. He didn't talk. He didn't talk to those individuals. But I think understanding what he was... Didn't Hammerston assume that he would? I don't know if that was ever exactly fleshed out in the evidentiary hearing, but I think Hammerston said, you know what, he did. But I think he... Quite frankly, I think that Rowan just understood that that wasn't something that was going to fly. That wasn't mitigation evidence that was necessarily going to help him, the aunt and the two second cousins. Now with Jerome, again, there is no evidence because Hammerston did testify. We couldn't find him. We couldn't find him. We couldn't find his older brother, Jimmy, as well.  But again, let's consider what was going to be presented there with Jerome. It was going to be... And again, I know I'm somewhat merging our deficient performance analysis with our prejudice as well, but it's something that's got to be considered. Because Jerome was going to say, we grew up in a strict family. There was evidence that... Or at least some evidence that they were whipped with cords or whatever. But there's also evidence in the case that says, you know what, Connie was the one that was responsible for the majority of the discipline in this family. And so you have to take that into consideration as well. We talked about the dad's indiscretions and things like that. Petitioner left home in 1970. All of those indiscretions that occurred with the church and him assaulting or ministering to these vulnerable women in his church and then actually taking advantage of them, that comes to a head in the mid-'90s. That's over two and a half decades later. And so for the petitioner to actually have been impacted by all that they're talking about with the father's indiscretions, he's got to be around. And I don't think that that's ever fully established in the record. Was he, in fact, in prison for a lot of that? Petitioner, I believe, for a lot of it, yes, he was. Didn't Mr. Rowan at the evidentiary hearing, though, say that he blew it by not calling? I think those were his words. Calling as witnesses Letitia Miller and Janita Cole. And he said, why wasn't that efficient performance? Didn't he as much as say that? He did as much say that, but, again, I think there's some equivocation there because I think that was Rowan just simply attempting to follow his sword because he sets extremely high standards for himself, and I think that wasn't necessarily an accurate assessment of what went on in this case. He knew that Hammerston had not been able to find really anyone. He'd spoken with Tobias. Well, she found those two, put them on the witness list, and he didn't call them. Again, I think he doesn't call them because he knows that that isn't going to fly. That's all they could testify to. They couldn't testify to anything about his childhood. Where's the equivocation? He says, I blew it. That doesn't sound very equivocal. Well, forgive me, but I think I may be conflating him saying he blew it with everything in this case because Rowan at times he's saying, I blew it, and then at times he's saying, especially with regard to his interaction with Mr. Frederick himself, he says everything that Hammerston realized in the case is also accurate with regard to Rowan because Rowan testified that he was uncooperative himself. I understand he also says, well, my impression was somewhat colored by what Hammerston said, but he says things to the effect of we never talked about the things that really mattered or that I wanted to get to the issue of. But we're evaluating his performance. We have to conclude that Rowan made a strategic choice based on a complete investigation. What supports the notion that this investigation was complete? Complete is the word used in Strickland, right? What makes this investigation complete? Well, I'm going to say, I'll say that by also slightly referencing something that Rowan did say in the evidentiary hearing because I think this is the strongest evidence to indicate that there was some sort of strategy behind this. He said that it would have been a bad thing to show that the petitioner grew up in a dysfunctional family where the father masqueraded as a godly man and he left Connie Frederick to raise the kids from those other relationships that he had somewhat integrated into their own home. Rowan thought that that would be besmirching the dead. He also recognized that this, he was dealing with a different culture that he didn't quite understand and he thought that it was, like I said, I don't know that, he thought it would be disparaging. I really don't think he wanted to wade into that. I mean, that suggests it was strategic, but it also suggests that maybe he was ineffective for not putting in the effort to understand the culture he was going to have to talk about. With regard to that last element, I can see how you can see that both ways. But with the other things, I don't think that's the case. I think this was a strategic decision and he didn't think that there was anywhere to go with that. What do we do with the fact that throughout the trial, he's saying things that acknowledge the unanswered questions in the case? You know, we don't know why this happened, he snapped. When a reasonable, complete investigation would have yielded those answers. What do we do with the fact that he's acknowledging the unanswered questions that could have been answered by a complete investigation? Okay, I think when you're talking about that, I think it goes more to what he was talking about with the brain damage. And so with that, we know, considering what Rowan knew, he knew that the petitioner did not ever seem inclined to meet with anyone. He met briefly with Dr. Williams the first time, and then thereafter would not come out of his cell, as you were just mentioning. Dr. Williams' report suggested he thought maybe Mr. Frederick had organic brain damage, right? It did. Well, I'll say that it did say that, but also the state does not believe that Dr. Williams' report should be considered in this situation because it was not subsequently admitted at the evidentiary hearing trial. I know that it was something that was raised in the application for an evidentiary hearing, but then thereafter it was never. Let's assume we consider it. Okay. Did that put Mr. Rowan on notice that he needs to do something about his client's challenges in terms of working with the defense, that there might be some real organic problem here? Even then, I still don't think so, because again, let's consider what Rowan knew. He personally had received training in spotting individuals with possible brain damage or mental illness. We know that that's the case. We know that he didn't see any obvious signs or markers in the petitioner himself. What else did he have? Well, he had Dr. Roberson's prior evaluations of the petitioner for competency in 2004, and then I think it was 2007 as well. These are fairly close in time. Also, in both of those, what did he say in those evaluations? I think the petitioner fully denied ever having any type of mental health issues. He fully denied ever having any traumatic brain injury of any sort. That's the type of evidence, along with an uncooperative witness who Rowan himself said, you know, I got the impression, everything that we talked about, he did not seem like he wanted to sit down with any shrinks, is the word that Rowan used at the evidentiary hearing. I think given all of those things, the fact that Dr. Williams' report might have said that, or it did say that, I don't want to suggest that it didn't, the fact that it said that doesn't mean that the petitioner or that Rowan utterly failed in the performance aspect of that. Well, counsel, apart from Dr. Williams, Mr. Rowan made the head injury from the car crash the centerpiece of his argument at the Stage 2 Senate scene proceeding, but didn't present any expert evidence on that argument. Correct. Why isn't that deficient performance? Okay. Well, I think let's take into consideration the fact that Rowan actually did, when he made his penalty phase opening statement, he did fully intend, or I think he at least was leaning toward, calling Dr. Williams. He had some concerns about Dr. Williams. He said that he was going to get torn up on cross-examination, and the prosecutor in this case said, you know what, yeah, I was ready to go in on him. He was concerned that he wasn't exactly the type of witness they needed. So he finds somebody other than Dr. Williams. I mean, the point is he's picked this theory for the Senate scene, and he gets up and then he just doesn't have anything. I think Rowan attempted to go about this. And, again, we're talking here about deficient performance, I think in entirely other areas is the prejudice aspect of this, and we'll get to it later, I'm sure. Let's separate those two. Okay. I think that Rowan was attempting to go about doing this in the safest way possible, and the only way that he knew how to. What does that mean? In the fact that Nathan Frederick's testimony could not be rebutted or impeached in any way by the state. You see that, that I think the state itself was caught off guard when Rowan didn't actually end up presenting Dr. Williams as part of his case in chief in the penalty phase. Rowan, he gave some of those reasons that I just testified to earlier, or just argued earlier. But the real thing that clinched it for him was the fact that he did not want Dr. Williams to get up there and insert evidence, insert into evidence the fact that the petitioner had just, what would it be, less than five years earlier been acquitted of capital murder. I mean, murder is rare. We're dealing with a jury picked off the street. Murder is rare to these people. Capital murder even rarer. I mean, extremely rare is the individual who's been acquitted of capital murder only to go on and then commit another capital crime two years later. Rowan said he was tickled pink that the state did not present that. And so he's making these decisions as to I've got to, on the one hand, I really want to get this evidence in. We've got Nathan Frederick's testimony. I know that the state can't come back against that. And the state did say they wanted to present Dr. Roberson, but the trial court wouldn't let them. Rowan's balancing that with the fact of, with the consideration of the things that he wants to keep out. And so with those things in mind, I think that this is, it is reasonable trial strategy. He explained it. That's what he called it. Trial court asked him, is this a trial decision? Yes, this is a trial decision. He was going about it in the only way that he knew that it was going to be safe. Again, I think you always have to bear in mind the fact that the petitioner was extremely uncooperative. Do you have another case? Do you have a case that you can point us to where there was essentially zero mitigation evidence presented? And I know there's not zero. So how about one where something similar to what you've got, a very old piece of testimony or some very small piece of testimony relating to someone when they were a kid or something, and that's it? I mean, I'm not, this may be the least mitigation evidence that I've seen. I know that we like to cite Penn-Holster for considerations as to what is to be considered in federal court. You have to look at what the state court had before it. But in Penn-Holster, it was just the defendant's father, and that's it. And even in that situation, they found, you know, with it. What troubles me, and I don't mean to interrupt your response to Judge Carson's question, but picking up on Judge Carson's point, what concerns me is not so much the quantum, and there wasn't anything here as far as I'm concerned except for something very, very minimal, is that the chosen strategy at the penalty phase was based on something that was outside the ken of lay witnesses or lay jurors. Brain, organic brain damage is not something that a lay juror just automatically knows is a thing. Yet he insisted on that as a strategy in the case. But didn't have anything to support it other than arguments of counsel. That's not evidence. And instead, he raised a lot of open questions that could have been answered with an expert. So what troubles me is that he maintained the theory that needed an expert but didn't have it. So he did. He presented the suggestion of the brain injury from the car wreck and the fact that he was never the same after that. But even taking into consideration the two experts that the petitioner was able to put forward in the evidentiary hearing, I still don't think, I think you're still left with not very much. Is that a prejudice argument then? That is a prejudice argument. Could you make your prejudice argument? I'd like to hear it. That's fine. Yes. So this court knows, and I think that when counsel referenced Tenard, I don't think that that is how this court has utilized this. Time after time, this court has said that the effectiveness, the persuasiveness of mental health deficiencies, it rises and falls on a showing that it contributed to the crime. Time after time, they've said that. In Hooks, he said you've got to connect the dots. In Smith, you've got to provide some type of explanation. The petitioner doesn't have that link in this case. But connecting the dots is not the same thing as a straight line. And what I'm really trying to understand is what do the cases require? Do the cases require direct causal link, or do the cases require what we have here and contributing to, and our cases have said this is a significant contribution, or something that's not a straight line? What's your support for the straight line, direct causal link? I know that you said earlier that Rowan simply presented the suggestion of a brain injury. I really think that that's all that you have coming in with Dr. McGarahan, and Dr. Grundy, too. It's just a suggestion that this possibly is the straight line link. So you're saying that the argument of a defense lawyer about a car accident is equivalent to the opinion of an expert witness on organic brain damage? No, forgive me if that's what that communicated there. But I think it's a step further in the direction that the petitioner maybe wanted to go, or is arguing that it should have been gone in this case. But I don't think it's much further, because there is the no link. I think that also you have to consider the fact that his antisocial personality disorder was something that the state was going to grapple onto and hold onto, and they were going to present and highlight that, because this court has several times stated that that is an aggravating circumstance. It's not necessarily mitigating. But that wouldn't matter in this case necessarily, because Dr. McGarahan explained that often folks with organic brain damage, much like Mr. Frederick, exhibit antisocial personality disorder symptoms as well. Well, I think she said that that can happen. But at the same time, she also said that the brain damage doesn't necessarily— when we're dealing with individuals who are in their fifth or sixth decade of life, I mean, again, the petitioner is not someone who committed this crime when he was in his 20s or so and had testosterone running through his body. By saying that like she did, McGarahan basically said, you know what, the brain damage doesn't even explain what's going on here, because individuals at that age of life are supposed to be more docile. They're becoming more complacent. He's having more difficulties in his thinking than he is his behavior. He's able to exercise the restraint when it comes to those impulses, unlike what he might have done earlier. And so, again, you've got this inability to form the link. Another thing that I think—I don't know that it's necessarily been brought out yet, but one thing that Dr. McGarahan testified to in the evidentiary hearing was the fact that petitioner's verbal scores were very high. Now, you also have to understand that really one of the only things that Dr. Grundy pointed to— I understand he doesn't have the background that Dr. McGarahan did— but Dr. Grundy said, well, I'm seeing this discrepancy between the nonverbal scores, which seem to be way up here, and the verbal scores, which seem to be way down here. Dr. McGarahan comes in and says, hey, he did really well on these verbal scores. And so that totally just blows up any inference that Dr. Grundy might have presented to the jury. And so their own evidence in the evidentiary hearing is tending to conflict with what they're trying to say points to brain damage in this case. One of the other things is I know that we cited cases like Porter and Williams or Smith. Those cases all tend to have much, much more mitigating evidence than what we're dealing with here. Again, there's no direct link, Judge Rossman, like you've said. But we're not dealing with a Vietnam or Korean War vet hero like we did in Porter or like the Supreme Court did in Porter who had difficulty coming back and adjusting to life. There is no diagnosis of a mental illness. Neither one of the experts in this case could say that. That seems to heighten the importance of the mitigation. I don't see how it doesn't do that. That's certainly one take on it. But at the same time, I don't think that it means that the Oklahoma Court of Criminal Appeals decision is not one that no fair-minded jurist could determine was reasonable, though. So I accept that that is a counterargument to that. But I just don't think that it flies much here. Again, with both of these, I know we talked about it with Williams and I think with maybe Jerome Frederick as well, but with both of these experts, the one thing that would come in at trial was his prior murder acquittal, a capital murder acquittal in 2009, because we know that Dr. Grundy relied on that information when he was forming his analysis. We know that McGarahan said that she read Grundy's report in this case, and that is something that Rowan severely wanted to limit coming in. And so it's not just the inadequacy of the mental health evidence itself. It's now opening doors to other evidence that the petitioner would not have wanted the jury to hear. And then another issue, I don't think there was ever any indication that the petitioner's brain damage was treatable. Again, but it doesn't necessarily mean that much when Dr. McGarahan also says, well, his brain damage isn't really impacting his behavior that much these days anyway, because he's as old as he is. Another issue that was brought out in the evidentiary hearing was Dr. Grundy's anti-death penalty stance. It's worth noting he was against it, and there's no guarantee that the jury would have recognized that or seen right through that if that was brought up. Again, I want to go back to the fact that in this situation, and this is on the deficient performance prong of the brain damage, Rowan was dealing with a petitioner who held the key. He was the only way that he was going to be able to unlock any of this, I don't believe it was helpful, but potentially helpful brain damage information in his case. But we see no indication whatsoever that at the time of the trial, that the petitioner was even willing to sit down with anyone to do that. What relieves a defense counsel's obligation to try to develop mitigation when his client is a cooperative? There is nothing that does that, but he can... Because it doesn't. Rowan can beat his head... Is that fair? Because it doesn't. He can beat his head against that wall as much as possible, but what can he do? It's not like there was other, apart from Dr. Williams, who he planned on presenting, there was no other evidence in the record to indicate that the petitioner had any type of brain damage apart from Nathan Frederick's testimony. And so he put on, he made the best decision that he could. It was all that he could do in this case. So what's the strongest authority you have that a lawyer dealing with a recalcitrant client who's not cooperating in the preparation of a defense, that the client has to own that when they're up on post-conviction relief? What's your best one? As far as cases, I feel like I may be drawing a blank here. It's tough. I mean, that's why I'm asking. Yeah. I know that in Rompilla there was some claims that, or there was evidence that counsel just simply spoke with the defendant and his family and left it at that. But no, I'm sorry, I don't have a case that goes to that. That's all right. Perhaps this could be the one. If they were glaring, I probably wouldn't have asked. I'm going to ask your opposing counsel, too. Okay. I know we spend a lot of time talking about the penalty stage evidence. I would like to at least briefly touch upon the guilt stage evidence, because Petitioner has this claim of ineffective assistance of counsel for failing to do several things. It's a variety of things. He didn't ask the medical examiner his opinion on the manner of death. He didn't cross-examine the medical examiner regarding the investigator's narrative that contained the erroneous information. He didn't present someone like Dr. Bux. Petitioner claims in his brief that this case hinged on medical expert testimony. And I'm sorry, I don't think that could be any further from the truth. They all but ignore the declarations of Connie Frederick that she made through sign language. Dijon Diggs, the victim's granddaughter, testified that when she was in the floor of her room, she indicated through sign language by holding a D up to her head when asked who did this. Well, that was how she indicated. That was her sign for Petitioner. The paramedic who helped escort Connie Frederick to the hospital, along with Ms. Diggs, he stated, you know, I could see them signing back and forth between the two of them. There were some very, very specific questions that were asked. Connie Frederick was alert. She was awake. She said her son had done it to her. She said he had an object in his hand. She doesn't know what the object was. She doesn't know how many times she was hit with it. She knows that she passed out during the assault and then came back to and it was still going on. Those are all very specific claims. And to say that an investigator's narrative that's dependent upon a sentence, a parenthetical, even in a sentence, that doesn't matter. At the evidentiary hearing, the medical examiner, Dr. Harrison, said, well, yeah, I relied on that, but I also relied on a lot of other evidence as well. I relied on my examination of the body. I relied on the police reports. I relied on subsequent supplemental reports that corrected that information and said that no one did witness the assault. He also said, when I saw that information, I just took it to mean that Ms. Diggs had generally witnessed the assault, which is accurate. She witnessed the assault of Connie Frederick in the kitchen. She witnessed her own assault thereafter as she was trying to flee from the petitioner throughout the house. There were other neighborhood kids who witnessed the assault outside and saw that he had something in his hand and he was trying to pecker with it. But probably more important than any of all that, Dr. Harrison testified at the evidentiary hearing that despite the misinformation that was in the investigator's narrative, his opinion as to the manner of death was not changing. The petitioner has presented Dr. Bucks to say that, you know, this was someone who could have refuted everything that the state was trying to say through Dr. Harrison. Well, that also overlooks the fact that Dr. Hahn, who is the neurosurgeon who treated Connie Frederick, said these injuries, they're inconsistent with a fall. Maybe if she was standing four or five feet up in the air and did a header onto the floor, maybe I could see it then, but I'm just not seeing it. And Dr. Bucks, he didn't even go so far as to say, I'm not seeing an assault. He didn't go as far as to say, I am seeing a fall. He just said that he would have determined, he would have said the manner of death was undetermined. Undetermined versus the evidence or the testimony that the jury heard regarding exactly how Ms. Connie Frederick had said that it was the petitioner who did this, that wasn't going to change anything. It wouldn't have scored any points for the petitioner in this case. I can see that my time is almost done. I will simply leave you by asking you to affirm the district court's determination that the petitioner was not denied the effective assistance of appellate counsel. Thank you. Thank you, counsel. Just briefly, Your Honors. Dr. Harrison, at the evidentiary hearing when he was subject to thorough cross-examination, admitted that the facts were consistent with a fall. On cross-examination, he was in fact rehabilitated, and his final statement was that he would not change his opinion. But imagine had he made those admissions in front of a jury. Imagine he had said in front of a jury, yes, it could also be consistent with a fall. And then imagine that had trial counsel done his job and consulted with an independent forensic pathologist who could have brought out all of the weaknesses in the state's case and brought out with his 40 years of professional opinions, his finding would be that it was undetermined. Now, the state's counsel has said that this finding of undetermined is not so compelling to be prejudicial, but he found that the evidence was directly contrary to the state's theory that Ms. Frederick had been beaten with a brick. She exhibited no pattern injuries. She had no skull fractures, no facial fractures. And I would remind the court that the OCCA, in its direct appeal opinion, egregiously misstated the record and said that she had a skull crushing blow. Nothing could be further from the truth. Imagine all of these things had been presented to the jury. This could have created residual doubt, which could have followed Mr. Frederick into the penalty phase. And this court has recognized the importance of residual doubt in Harmon as the Supreme Court. In fact, a very recent capital jury sentencing project report found that residual doubt is the single most compelling mitigating factor. And because of Mr. Rowan's deficient performance, he robbed Mr. Frederick of carrying that doubt into the second stage. I'd like to touch on just a couple of points that the state's counsel made With respect to the two witnesses that Ms. Hammerson in fact listed on her witness statement, the state argued, we know he read these witness summaries and made the strategic decision. No, we don't know he read these summaries. At the evidentiary hearing, when he was asked whether he was aware about these witnesses, he said, well, I'm aware of them now more than I was then. From that, we can't deduce he even read those summaries and made any type of strategic decision. With respect to the state's argument that much of the negative information about Nathan Frederick Sr. had to do with events that transpired after Mr. Frederick left the home, well, that certainly wouldn't account for the five illegitimate children that were born and placed in the home without any explanation while Mr. Frederick was still in the home. So, yes, some of the culmination and the exposure of these events  But Jerome certainly had evidence that placed Mr. Frederick in the home while certain activity was going on. With respect to the state's statement that Rowan set high standards for himself, well, this court has twice found that Mr. Rowan has rendered deficient performance for the precise types of issues that we presented to this court today. And this court is not allowed to indulge in post hoc rationalizations of an attorney's alleged strategy when we know his strategy, what it was, and what he did. He did nothing. With respect to the state's argument that this court could not consider Dr. Williams' affidavit present on post conviction, that is not correct. Pinholster only requires that the evidence be presented to the state court. This affidavit and report was presented to the OCCA. So it's properly before this court for consideration. Finally, much was stated about the brain damage and how there is no causal link between the brain damage and the crime in this case. The Supreme Court has unequivocally stated that there is no requirement to show a causal link. But what we have shown is there was a direct link between Mr. Frederick's violent behavior and his brain damage. And as I stated in my opening, Dr. McGarahan talked about how this brain damage was a contributing factor to his violent behavior. And it's for these reasons we ask this court to reverse the district court's opinion denying habeas relief. Thank you. Any questions? Thank you, counsel. Thank you. Good timing, those comments. Well, we appreciate arguments from both counsels. Very helpful. The case will be submitted and counsel are excused.